**ALLTRANSPORT, Incorporated**

*v.*

**UNITED STATES.**
**C. D. 1807;**
**Protest Nos. 248592–K, 248593–K.**

United States Customs Court
First Division.
Sept. 20, 1956.

182

Barnes, Richardson & Colburn, New York City (Edward N. Glad, New York City, of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Joseph E. Weil and Richard E. FitzGibbon, Trial Attys.), New York City, for defendant.

Before OLIVER, MOLLISON and WILSON, Judges.

MOLLISON, Judge.

The merchandise the subject of these protests is described on the invoices as "Spungel (Surgical material)" and was assessed with duty at the rate of 15 per centum ad valorem under the provision in paragraph 41 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 41, as modified by the Presidential proclamation relating to the General Agreement on Tariffs and Trade, reported in T.D. 51802, for manufactures, wholly or in chief value of gelatin. The claim in each of the protests is for duty at the rate of 12½ per centum ad valorem under the provision in paragraph 5, as modified by the Presidential proclamation relating to the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, for—

"* * * all medicinal preparations * * * obtained naturally or artificially and not specially provided for * * *."

There is no real dispute as to the facts. The merchandise consists of what are known as absorbable gelatin sponges. They are sponges made of pure gelatin not medicated in any way, and used in surgery to stop excessive capillary and venous bleeding by bringing about a firm, adherent blood clot. They also help the surgeon to maintain a clean field so that it is not necessary to continually remove blood from the area of the surgery. After the clot is formed, the sponges are left inside the patient and are absorbed by the system of the patient within a period of from 4 to 6 weeks, disappearing without any trace.

It is clear that the manner in which the sponges accomplish their function of aiding the blood clotting is entirely physical, so far as the sponges themselves are concerned. This was described by the single witness who testified, the vice president of the ultimate consignee in charge of purchase and sale of the product, as follows:

"Well, the blood going up through the myriad interstices of the sponge, there are platelets which—they are little disks, which come in contact with the gelatin, and in doing so, they release thromboplastin, which in turn, reacts to produce thrombin, which in turn reacts with the fibrinogen in the blood, to produce fibrin, which becomes the tightening mesh which ties in on the basis of the blood clot.

"Now, that whole thing hangs on this gelatin framework or gelatin skeleton, I might say, and serves as a track, or these little traces of fibrin serve as a track or a route of travel for small blood vessels growing into the area and for the growth of the cellular structure up through this sponge, which eventually, as I say, becomes—disappears and becomes part of the system. It serves as a skeleton on which this new cellulose structure is built." (Tr. pp. 28–29.)

In other words, it is the *form* or *construction* of the article, as having "myriad interstices," which causes a physical reaction on contact with the blood, whereby the blood, itself, releases certain substances and undergoes certain reactions which result in the desired clotting.

It also appears that, while in a normal person, under normal conditions, the blood will form a clot, the use of the gelatin sponge brings about a more rapid clotting, or accelerates the clotting of the blood. Moreover, in so doing, it appears that the gelatin sponge does not, itself, cause a foreign body reaction, nor does it produce fever, as, presumably, other substances might do.

The record shows that the name of the merchandise, "Spun-Gel," is a registered trade name for absorbable gelatin sponge, U.S.P.; that the merchandise is imported in double packaging to preserve sterility; and that it is sold in the condition imported to hospitals, surgical and medical supply houses, pharmacists, dental surgeons, and doctors. It also appears that it is not sold otherwise, except upon prescription, and that it conforms to the specifications of the monograph on absorbable gelatin sponges in the United States Pharmacopeia and to the specifications of the same in the United States Dispensary.

It is the plaintiff's position that the article at bar responds to the definitions which have been laid down for "medicinal preparations" in cases arising under both the present and previous tariff acts, and that, inasmuch as the provision for medicinal preparations is a designation by use, under the doctrine of relative specificity, it is more properly applicable to the merchandise at bar than the provision for manufactures of gelatin, under which it was classified.

The defendant's position is, first, that, in view of the admitted absence of medication in the sponges and the lack of proof that gelatin has therapeutic properties, the articles at bar cannot be medicinal preparations, and, second, that the sponges in issue are tools of the surgeon in the same sense that cotton packs and metal clamps used to stop bleeding are surgical tools, and, as such, are not medicinal preparations.

Counsel for both parties, cite and discuss the definition of "medicinal," suggested in 1891 by the late Circuit Court Judge Lacombe in the case of Dodge & Olcott v. United States, reported in 130 F. 624, 625, as follows:

"* * * As to the precise meaning of the word 'medicinal,' for the purposes of this particular case I will assume—without undertaking to say what may or what may not be the conclusion which the court will arrive at when it becomes necessary, if it does hereafter, to determine the precise meaning of that, I will assume—that it confines the noun with which it is coupled to something which is of use, or believed by the prescriber or user fairly and honestly to be of use, in curing or alleviating, or palliating or preventing, some disease or affection of the human frame."

While the foregoing definition does not seem to have been accepted as encompassing all the articles or substances which may be embraced within the term "medicinal preparations," it has, on occasion, been cited and quoted by our appellate court as sufficiently authoritative to serve as a standard by which particular importations might be judged. See Britt, Loeffler & Weil v. United States, 7 Ct.Cust.App. 118, at page 121, T.D. 36428, and Smith & Son Manufacturing Co. v. United States, 15 Ct.Cust.App. 277, at page 278, T.D. 42468.

184

That the article at bar is covered by the rather broad provisions of the foregoing definition seems to be obvious, that is to say, the evidence shows that it is something which is of use in alleviating or palliating an affection of the human frame, i. e., it is used in stopping excessive capillary and venous bleeding by accelerating the clotting action of the blood.

In so holding, we assume that the term "medicinal," as used in the statute, is not confined to those preparations used only by the physician but includes, as well, those used by the surgeon and the obstetrician,[1] and that excessive bleeding, occurring in surgery, is an "affection of the human frame."

■ Counsel for the defendant argues, in the brief filed in its behalf, that the lack of evidence that the chief use of all gelatin is as a medicinal preparation, or that gelatin has therapeutic properties, requires a holding that the sponges at bar are not medicinal preparations. We know of no case which holds that the chief use of the *ingredients*, or even of the chief or sole ingredient, of medicinal preparations is the determinant of use for classification purposes—it is the chief use of the *preparation* which controls classification under the provision for medicinal preparations. United States v. Wm. Cooper & Nephews, Inc., 22 C.C.P.A., Customs, 31, T.D. 47038.

■ Similarly, it is not necessarily the therapeutic value of the ingredients which endows a preparation with its medicinal character. It may well be that a medicinal preparation may contain one or more ingredients each or some of which have therapeutic value. On the other hand, it may be, as in the case at bar, that an ingredient, not having therapeutic value or properties *per se*, may be so prepared as to possess in its prepared form those qualities which are properly described as "medicinal." The science and art of medicine has invented, discovered, and utilized for their medicinal properties many substances and things which were for centuries considered foreign to that field.

Counsel for the Government draws an analogy between the article at bar and cotton packs, surgical clamps, and scalpels. As to the latter two types of articles, clamps and scalpels, it is doubtful whether they might be properly described as "preparations," but it is sufficient to say that, in any case, they are more specifically provided for under the provision for surgical instruments in paragraph 359 of the tariff act than under the provision for medicinal preparations.

As to cotton packs, there is nothing to show that they have the same or similar uses or effect as the merchandise at bar, and the court is, consequently, unable to determine the closeness or remoteness of the analogy suggested by counsel.

■ So far as the court has been able to determine, the situation posed by this case, wherein the medicinal property of the article in question is attributable to its physical structure and not to any drug, chemical, or biological action of the preparation or its ingredients, is of novel impression. The only case which we have been able to find which bears a resemblance to the issue is United States v. Von Oefele, 4 Ct.Cust.App. 15, T.D. 33200. In that case, a volcanic earth, dried and ground in a mill and used for external application to the human body

1. The term "medicinal" is the adjective form of the noun "medicine," for which Webster's New International Dictionary, 2d ed., 1945, gives, among others, the following definitions:

" * * * 2. a The science and art dealing with the prevention, cure, or alleviation of disease. b In a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician. * * * "

It does not appear to be contended herein that the term "medicinal" relates only to things used by the physician, as distinguished from the surgeon.

as a mud bath, was held not to be a medicinal preparation, the court saying:

"It is common knowledge that a great many articles of every day use, but which are never suspected of being, and are not in fact, medicinal preparations, are, when warm or hot, applied externally to the human body for the purpose of alleviating pain, and that the relief in such cases comes from the heat applied and exclusion of air thereby accomplished, and not from any medicinal properties in the articles so employed. This earth, which is used as a sort of mud bath, we think, is of that class, and is not a medicinal preparation within the meaning of that term as used in the paragraph."

It is clear, however, that the court's ruling was based, not upon the fact that the relief of pain was achieved by physical means, i. e., heat and the exclusion of air, but upon the fact that there was no evidence to establish that the product was seriously regarded as a medicinal preparation or that it was a substance used in medicine and prepared for use of the apothecary or physician to be administered as a remedy in disease. Compare, in this connection, the dissenting opinion of the late Judge Bland of the Court of Customs and Patent Appeals in Scharf Brothers Co., Inc., v. United States, 25 C.C.P.A., Customs, 32, 36, T.D. 49038. Note also Vitab Corporation v. Knox Co., 143 F.2d 883, at page 888, 31 C.C.P.A., Patents, 1205.

In United States Express Company v. United States, 4 Treas.Dec. 110, T.D. 22759, this court had before it an issue as to the classification of merchandise, consisting of a foundation of cotton batting, with one surface thereof treated with an antiseptic preparation. The court held that such antiseptic cotton was a medicinal preparation, and, while it is true that it clearly appeared in that case that the medicinal quality of the preparation was attributable to the antiseptic with which the cotton had been treated, the case is here cited for the reason that no real distinction is apparent between

medicinal properties imparted by reason of treatment with an antiseptic and those imparted by reason of the physical structure of the preparation.

On the record presented, the protest claim for duty at the rate of 12½ per centum ad valorem under paragraph 5, as modified, is sustained, and judgment will issue accordingly.